Filed 1/8/14  Zacadia Financial Limited v. Fiduciary Trust Internat. of Cal. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ZACADIA FINANCIAL LIMITED PARTNERSHIP,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>FIDUCIARY TRUST INTERNATIONAL OF CALIFORNIA et al.,<br><br>    Defendants and Respondents. | G047613<br><br>(Super. Ct. Nos. BC 396443 consol. with BC 396473)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Los Angeles County,
Victor E. Chavez, Judge.  Affirmed.

        Jenkins Mulligan & Gabriel, Larry W. Gabriel; Peitzman Weg and Howard
J. Weg for Plaintiff and Appellant.

Farmer & Ridley, Richard D. Cleary; Winston & Strawn, Rolf S. Woolner, Justin E. Rawlings, Jenna W. Logoluso and Linda T. Coberly, pro hac vice, for Defendants and Respondents.

\*          \*          \*

Mark Hughes, founder of Herbalife, died in 2000. This case is yet another in a handful of appellate decisions relating to the administration of his estate.[1] The basic background facts established in those opinions and the record before us tell a remarkably consistent story: When Hughes died in 2000, most of his nearly $400 million estate was held by the Hughes Family trust, which in turn consisted of ownership of various limited liability companies, the most important of which was the Hughes Investment Partnership. The estate faced death duties of slightly more than $212 million, all immediately due, but it was able to finesse those taxes down to about $50 million by the device of a "*Graegin*" loan (after *Estate of Graegin v. C.I.R.* (1988) 56 T.C.M. (CCH) 387, 1988 WL 98850). The appeal of a *Graegin* loan is that an estate borrows money *today*, to pay its estate

---

[1] The handful includes two published opinions: *Hughes v. Pair* (2009) 46 Cal.4th 1035 and *Klein v. Hughes* (2005) 133 Cal.App.4th 121. *Hughes v. Pair* arose out of alleged quid pro quo sexual harassment on the part of one of the trustees of Hughes' family trust toward the third of Hughes' four wives in the context of whether the trust would fund the rental of a beach home for another month. *Klein v. Hughes* – which we will call *Klein v. Hughes I*" – involved the prorating of estate taxes among beneficiaries.

At the request of appellant Zacadia, we also take judicial notice of *Klein v. Hughes* (April 20, 2004, A103940) [2004 WL 838198] [nonpub. opn.] ("*Klein v. Hughes II*") which provides an excellent summary of some of the background which led to the transaction before us. Courts of Appeal take judicial notice of nonpublished opinions which provide such relevant background all the time. (E.g., *McClintock v. West* (2013) 219 Cal.App.4th 540, 543, fn. 2; *Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1530, fn. 7 ["Judicial notice may be granted if the documents for which notice is sought are at least minimally relevant to the instant appeal."]; *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 364 [taking judicial notice of four prior unpublished opinions relating to contentious custody dispute]; *In re Kinney* (2011) 201 Cal.App.4th 951, 954, fn. 3 [taking judicial notice of prior unpublished opinions bearing on appellant's status as vexatious litigant]; *Klein v. Hughes I, supra*, 133 Cal.App.4th at p. 124, fn. 1 [also taking judicial notice of the unpublished opinion in *Klein v. Hughes II*].)

Also, apparently because of a familial connection between one of the trustees of the family trust and a senior justice in the Second District (see Welkos, *A Boy and his $400 million* (L.A. Times Sept. 13, 2005, accessible at articles.latimes.com/2005/sep/13/entertainment/et-herbal13 (as of Nov. 15, 2013)), the entire Second District Court of Appeal has had to recuse itself in the cases arising out of the Hughes estate. (See also *Klein v. Hughes I, supra*, 133 Cal.App.4th at p. 124, fn. 1].) The opinions mentioned above all came out of the First District in San Francisco. This appeal, however, was assigned by the California Supreme Court to the Fourth District, where the administrative presiding justice directed it to this division.

2

taxes *today*, and gets to deduct on its estate tax return *today* all the accumulated interest on the loan it will pay *tomorrow*. And tomorrow in this case was 25 years into the future.

As might be gathered from that description, there is no question the *Graegin* loan in this case was a really good deal for the Hughes estate. In specific terms, the main arm of the estate, the Hughes Family Trust, borrowed $50 million in 2002 to pay the estate taxes, but since the loan would not be due until 2027, the estate got to deduct in 2002 all the interest that would accrue from 2002 to 2027, about $300 million worth. With such a large deduction taken all at once, the ostensible size of the Hughes estate shrank from something like $400 million to a mere $100 million and change, and the estate only had to pay about $50 million in estate tax.

So where did the $50 million come from? It was part of a circle beginning in one pocket of the Hughes estate and ending up in another pocket. The Hughes Investment Partnership lent plaintiff Zacadia Financial $50 million at 8.60 percent interest for 25 years – Zacadia had no assets of its own and in fact was created for the sole purpose of taking money from the right hand of the estate and transferring to the left hand – and then Zacadia turned around and lent the Hughes Family Trust the same $50 million at 8.75 percent interest, with both loans being simultaneously due in 2027. The benefit to Zacadia from the transaction is that it would turn a nifty $12 million profit. The catch was that it would have to wait 25 years for that profit.

Somewhere between 2006 and 2008, however, Zacadia decided it wanted its money *immediately*. So it filed this action to get it. Its theory was that four discrete "breaches" of the loan agreement justified the immediate acceleration of the loan so that Zacadia would receive its entire $12 million profit about two decades early, without even a discount for present value. The most significant of these breaches was the transfer of a 14 percent interest in the Hughes Investment Partnership to Mark Hughes' son Alexander in order to fulfill a gift of 2 million shares of Herbalife stock the late father directed be made by the Hughes Family Trust to his son – an interest worth about $40 million. The

3

case went to a jury in 2012, and while the jury found the four alleged breaches were indeed breaches, it also determined that none of them was "material," therefore there should be no acceleration of the loan. Even after the transfer of a 14 percent interest in the Hughes Investment Partnership to the son, the family trust's holdings in the partnership were still worth $285 million, beside which $12 million was pocket change. Zacadia was sent away empty-handed to await its 2027 payday.

The big legal issue in this case centers on the trial court's instruction to the jury that a breach would have to be "material" to justify *acceleration* of the loan. Zacadia contends the jury should have been instructed that it was entitled to damages regardless of whether a breach was material. We reject the argument, which fails to take into account the nature of the case Zacadia actually presented to the jury and the relief Zacadia requested. Zacadia was very clear at trial it wanted the entire balance of the loan accelerated so it could collect in 2012 the profit that was due it in 2027, including 15 years worth of future interest.

Zacadia, in short, not only went for the whole enchilada, it tried to grab the entire combo plate. The common law of California, however, isn't very keen on forfeitures, penalties and accelerations of loans absent material breaches justifying them. The trial court was spot on in its instruction to the jury. We affirm the judgment for the defense.

## FACTS

A. *The Death of Hughes, The Missing 2 Million Shares, and the Graegin Loan*

Mark Hughes founded Herbalife. He died in 2000. At the time of his death, his estate had a value of roughly $400 million.[2] Before his death, Hughes created the two entities which feature most prominently in this case: The Hughes Family Trust and the Hughes Investment Partnership. We will refer to these entities, respectively, as

---

2    The most exact figure from the record is what the estate would tell the probate court in November 2002 – about $386 million.

4

the "family trust" and "family investment partnership" (or sometimes simply as the "trust" and the "partnership") to emphasize their status as being two pools of wealth *within* Hughes' estate. At the time the *Graegin* loan which is the subject of this appeal was made in 2002, the family trust owned 99 percent of the family investment partnership.

With Hughes' death in 2000, the estate faced two distinct problems. One was a Brobdingnagian tax bill that would amount to $212 million if no action were taken. The other problem was the quandary over what to do about a gift of 2 million shares in Herbalife to be made *by the trust* to Hughes' only son Alexander, who was nine years old at the time.[3] The difficulty was that the family trust didn't actually have 2 million shares of Herbalife stock (in fact it didn't have any shares of Herbalife stock), because those shares were owned by the family investment partnership. Further, even though the trust owned 99 percent of the partnership, the trust still had no legal power to compel the partnership to give 2 million of its shares of Herbalife to Alexander. Given the absence of actual shares owned by the family trust, there was the possibility, under the probate doctrine of ademption, that Alexander would not receive the gift of stock that his father had intended for him.[4]

The twin dilemmas of the big tax bill and the problem of what to do about the trust's provision that Alexander receive 2 million shares of Herbalife stock were both dealt with in the period 2000 through 2002. The 2 million share ademption problem was addressed first, in late 2000, though it would not be ultimately solved until July 2005. To

---

[3]     At all relevant times in this case Alexander's affairs have been managed by a custodian and technically transfers to him have been to his custodian. For reader convenience, however, we will simply say "Alexander" when discussing such transfers or his interest in the case.

[4]     Under the probate doctrine of ademption, it was at least arguable that Hughes the father had authorized the 1997 transfer of shares with the intent to passively revoke the gift of 2 million shares to Hughes the son. (See *In re Sullivan's Estate* (1954) 128 Cal.App.2d 144, 147 ["'Ademption of a specific legacy is the extinction or withdrawal of a legacy in consequence of some act of the testator equivalent to its revocation, or clearly indicative of an intention to revoke. The ademption is effected by the extinction of the thing or fund bequeathed, or by a disposition of it subsequent to the will, which prevents its passing by the will, from which an intention that the legacy should fail is presumed.'"].)

begin to solve the ademption problem, in late 2000 the family trust sought instructions as to what to do from the probate court.  By February 2001, the probate court gave the trust half an answer:  The trust was to satisfy the gift of 2 million shares to Alexander by "whatever means necessary."  But the court did not say what those means should be.

Meanwhile, the $212 million tax bill had to be confronted.  A solution was found in the summer of 2002.  An estate attorney for the late Mark Hughes, tax lawyer Kenneth Zifkin, came up with the idea of the "*Graegin*" loan.[5]  We have already noted the basics of the deal:  The estate would borrow $50 million, which would be paid back in a balloon payment in 25 years.  The accumulated interest over those 25 years would amount to about $300 million, and all of that $300 million could be deducted from the estate's tax return in 2002, the upshot being that instead of an estate worth $400 million taxed at a 55 percent estate tax rate, there would only be an estate worth $100 million taxed at the 55 percent rate.  The "tax savings" would be about $167 million.

Originally, it was hoped that genuine third party lenders might provide the initial $50 million loan, but none offered satisfactory terms.  So Ziskin proposed to create Zacadia, which would play the role of a friendly lender.[6]  Zacadia itself, of course, had no money of its own to lend – it is effectively a wholly owned subsidiary of the Kenneth Ziskin family[7] – so the transaction was arranged in such a way that Zacadia would be a conduit between the $50 million it was itself borrowing from the family investment

---

[5]     Ziskin billed the estate at least $23,265 for his research on the *Graegin* theory.  He was thus paid for his work.  There is nothing in the record to indicate that the family trust ever promised him a cut of the $167 million in estate taxes the estate saved because of it.  (See *Passante v. McWilliam* (1997) 53 Cal.App.4th 1240, 1248 [corporation's attorney could not enforce oral promise to receive 3 percent of the stock in what turned out to be a highly profitable corporation in return for having procured loan because he gave no consideration for that promise].)

[6]     The parties would put dramatically different spins on the non-participation by third party lenders (at least two major insurance companies are mentioned in the record) at trial.  Zacadia would argue that Ziskin was being a hero to the trust by offering better terms than the third party lenders.  The trust would argue that Ziskin subtly sabotaged the relationship between the third party lenders and the trust so as to put himself and his creation Zacadia in the position to make a profit on the *Graegin* deal.

[7]     There is no dispute that Zacadia is owned by HJM Arcadia LLC, and HJM Arcadia LLC is owned by the Ziskin family trust, aka the Westholme Trust, for which Ziskin has taken the Cromwellian title, "Trust Protector" and nothing stops Westholme from making Ziskin himself its beneficiary.

partnership and the same $50 million that was being lent to the family trust by Zacadia.[8] As far as our record is concerned, and as noted in *Klein v. Hughes II*, an unpublished opinion dealing with this very loan, the IRS was perfectly fine with the money going in a circle.

On November 8, 2002, the family trust sought approval of the transaction from the probate court, which was given on November 22, 2002. Two days later, the papers were signed. Zacadia borrowed $50 million from the family investment partnership at 8.60 percent, Zacadia lent $50 million to the family trust at 8.75 percent. The interest rate "spread" of .15 percent would amount, by 2027, to $12 million, which would be pocketed by Zacadia. There would be a single payment of $10 million in 2005 to be made by the family trust to Zacadia and by Zacadia to the family investment partnership (hence the effect was a wash), but otherwise there were to be no payments until 2027 – when it would all come due along with the accumulated interest.

In fact, the transaction was structured in such a way that Zacadia would not even have to write a check to pay off the money it had borrowed from the family investment partnership. The monies due to payoff Zacadia's loan from the family investment partnership would be paid directly by the family trust *to* the family investment partnership. Zacadia, as mentioned, would simply get the net $12 million interest rate spread. Zacadia also received a $124,885 loan origination fee at the time of signing in 2002.

It should be noted here that part of the *Graegin* loan transaction was a security agreement which provided that 100 percent of the family investment partnership would serve as collateral for the putative loan that Zacadia was making to the family

---

[8] The ultimate "spread" to be enjoyed by Zacadia ended up being a quite modest fifteen one hundredths of one percent between what one part of the estate borrowed and what another part of the estate lent. In another September 2002 memo, Ziskin noted that one of the life insurance companies who had been approached on the deal wanted an effective interest rate spread of 1.71 percent, which meant the estate did about 11 times better with friendly lender Zacadia than it would have done with that life insurer.

trust.  The security agreement also provided that the family trust would have title to all the collateral during the term of the loan,  and take whatever action was necessary to preserve the security interests of Zacadia in the collateral.  The agreement also contained an acceleration clause which, read literally, allows Zacadia to accelerate the loan if there is any "event of breach."[9]

The November 2002 *Graegin* loan solved the problem of the large tax bill, but the question of what to do about the 2 million shares to Alexander remained.  It would take almost another three years to resolve it.  One factor in the delay was the shadow cast over the *Graegin* loan itself by the hurried circumstances of its approval by the probate court in November 2002.  Alexander's mother appealed from the order approving the loan, and affirmance was by no means a cinch.  Yet reversal could mean undoing the approval of the loan and thus potentially spoil the $167 million in tax savings.  The story of the appeal is set out in the unpublished case of *Klein v. Hughes II*, which explains that the trust entered into an agreement with the IRS on October 10, 2002, which gave the estate only 45 days to finalize the *Graegin* loan.  The trust sought approval for the loan from the probate court on November 8, 2002, with a hearing date of November 22, 2002, just two days before the 45 days was set to expire.  Alexander's mother, however, only received drafts of all the documents around November 13, 2002.

---

[9] The clause reads in pertinent part:
"This note may not be redeemed or repaid prior to the Maturity Date except as set forth in the next paragraph.

"At the option of the holder hereof exercised by written notice to the undersigned, this Note shall become immediately due and payable in full (in the full principle [*sic*] amount specified above minus, if applicable, the amount of any payment theretofore made on September 9, 2005) upon the occurrence at any time of any of the following events (each, an "Event of Default"); provided, however, that upon the occurrence of any of the Events of Default set forth in items 3, 4, or 5 below, this Note shall automatically become so due and payable in full (in the full principle [*sic*] amount specified above minus, if applicable, the amount of any payment theretofore made on September 9, 2005), without notice or demand and without the need for any action or election by the holder hereof;

"(1) Nonperformance.  Failure in the performance or observance of any of the terms or conditions contained in the Security Agreement or other agreement securing, guaranteeing or otherwise pertaining to this Note after giving effect to any applicable curative period which may be contained therein

" . . . ."

Because we deem the trial court's jury instruction to have been correct, there is no need to address the trust's argument that the "curative period" language in the acceleration clause meant that, as a matter of law, there was no default in the 14 percent transfer.

And it was not until November 20 that the trust made it crystal clear to the court that the estate was bucking up against a 45-day deadline and needed to have the loan executed by November 24.  The shortening of time necessary to obtain approval and consummation of the *Graegin* transaction was thus a rushed job, and the order obtained in such a hurry was fraught with the potential for reversal.  While the *Klein v. Hughes II* opinion *did* affirm the November 2002 order approving the *Graegin* loan in April 2004,[10] the appeal necessarily cast a shadow over the estate's ability to plan for the future.

There was also the problem that the family trust actually had no power to compel any distributions from the family investment partnership, and, as Ziskin himself would point out in a memo in 2007 (after *Klein v. Hughes II* had been issued), "[a]ny effort to compel the distribution, particularly if successful, could have jeopardized the *Graegin* strategy and cost the Trust the tax savings that were ultimately determined by the Court of Appeal to be $167 million."

Eventually, however, the ademption problem was solved in July 2005 by having the family trust transfer to Alexander a 14 percent interest in the family partnership.[11]  The record indicates the value of the 14 percent interest transferred to Alexander was somewhere between $35 million and $40 million.  Zacadia preferred the higher figure at trial in this case but uses the lower figure in its opening brief.)  If one does the math, valuing 14 percent of the partnership at between $35 million to $40 million means that, after the transfer of that 14 percent, the trust still held an interest in the partnership worth no less than $245 million and – if one uses the $40 million figure Zacadia preferred at trial – up to about $285 million.  It should be noted here there was evidence that at the time of the 2002 loan the collateral pledged by the trust, including the partnership, was worth about somewhere between $265 and $280 million.

---

[10]    Which, we note, is a fairly short time given the size of the record and the complexity of the transaction.

[11]    Zacadia calls this agreement the "CFA" for custodian funding agreement.

But the solution to the ademption problem set the stage for this litigation and the ensuing three-week trial. The parties put dramatically different spins on just how this case got to be filed. Zacadia's side of the story is that Zacadia's general partner Hinda Ziskin – Kenneth Ziskin's wife – became concerned about the transfer of that 14 percent chunk of collateral securing Zacadia's loan, ostensibly lost by the custodian funding agreement to Alexander, tried to resolve the matter by asking for information about the trust's finances which she didn't get, and was then forced to file this action in August 2008.

The trust's side of the story is that Kenneth Ziskin himself got into significant financial trouble, including incurring a bill of over $800,000 to the IRS because, as he admitted in divorce proceedings involving Hinda's predecessor, he and his second wife lived so extravagantly that they simply didn't pay federal income taxes despite earning a very high income. Thus, according to the trust, Zacadia, i.e., the Ziskin clan was casting about in the period 2006 through 2008 for a way to solve its financial troubles, and speeding up the $12 million anticipated 2027 profit on the *Graegin* loan was its preferred solution.

Two more facts, both involving the state of the partnership *qua* security for Zacadia's loan are worth mentioning before we describe the litigation as such. First, in August 2007, the family trust found $44.2 million to buy back from Alexander the 14 percent interest in the investment partnership it had assigned him back in 2005. That is, by the end of 2007, the actual percentage interest held by the trust in the partnership which had been the collateral for the loan from Zacadia in the first place was back to the same 99 percent it was in 2002 when the loan was made. And second, by the end of 2010, the partnership, as a matter of investment values, had increased its worth to about $320 million.

C. *The Litigation and the Four Breaches*

Sometime in 2006 Zacadia wrote the trust a letter asserting that in light of the transfer of the 14 percent interest in the partnership from the trust to Alexander the trust was in default under the loan agreement, and further asserting that, pursuant to the terms of the agreement, all further distributions from the partnership to the trust should be diverted (our word, but that is the clear sense of the assertion) to Zacadia. Zacadia did not get around to filing its original complaint in this action, however until August 2008.

The case went to trial on Zacadia's second amended complaint filed a year later, in August 2009. All of Zacadia's complaints were clear that Zacadia wanted a court's imprimatur on the accelerated payment of the *Graegin* loan, such that all of it – including interest that was yet to be accumulated – was immediately due.

Trial took place in April 2012. As Zacadia's counsel told the jury in closing argument, "what this lawsuit is about" was the transfer of the 14 percent interest in the partnership to Alexander back in 2005. For Zacadia, the 14 percent transfer was a breach, and a breach that entitled it to accelerate the loan and receive "full payment," end of discussion. Full payment would have meant a jury verdict awarding Zacadia $343 million (the original $353 million due in 2027 minus the $10 million paid in 2005), though Zacadia's counsel hastened to tell the jury that $331 million of that $343 million would immediately go back to the family investment partnership in repayment of the partnership's original loan to Zacadia.

Zacadia also asserted three other breaches entitled it to immediate acceleration of the loan. One we have already alluded to – a provision in the security agreement that if the trust was otherwise in breach, Zacadia was entitled to all distributions that the family trust might receive from the family investment partnership. Since July 2005, the family trust had received about $42 million in such distributions, and Zacadia asked the jury to award that $42 million on top of the $343 million it otherwise felt entitled to by virtue of the acceleration of the *Graegin* loan.

11

The other two breaches were: Hinda Ziskin wrote letters in September 2006 and September 2007 asking for information about the partnership (in counsel's phrase, "the collateral") and the trust didn't respond to them. And, finally, in December 2007, Zacadia submitted a legal bill to the family trust for $1,648 in connection with a law firm's work on a UCC filing, which the family trust never paid.

Zacadia's counsel made it quite clear to the jury that termination of the loan and immediate acceleration of loan amounting to $343 million was what it expected.[12] He also argued that acceleration was the *only* thing Zacadia could have done, and thus concomitantly Zacadia had no duty to mitigate its damages.[13]

The trial court instructed the jury that only a *material* breach would give Zacadia the right to accelerate the loan, defining "material" to mean "important or serious enough to jeopardize Zacadia's right to receive what it is entitled to."[14] Using a special verdict form the jury found that (a) all four of the asserted breaches were indeed breaches but (b) none was material.[15]

---

[12] We quote Zacadia's counsel in closing argument:
 "And that's what brings us to the relief that we seek here today. Because Ms. Ziskin does not want to play with them anymore. She doesn't want to be in business with them anymore. And under the rules they wrote, she doesn't have to be.
 "And so we brought a breach of contract claim. We're going to shut this down. And when you help us ended this mess, you will deliver everyone their expectation from the outset.
 "The trust already got its $167 million tax saving. They got that day one. They got what they wanted. And they got it 60 million cheaper.
 "Ms. Ziskin has gotten nothing but a headache from this so far. [*Sic*: There was a $125,000 fee at the beginning.] And she is not looking forward to being in business with Mr. Klein and the other trustees for another 15 years."

[13] "Now, they have a question here. It's a defense of theirs about whether or not Zacadia could have mitigated or avoided their damages. I have no idea what in the record supports that. What were they supposed to do?
 "They accelerated. They sought an explanation. They got no explanation. They got denials. They had no ability to avoid this. So that's a big no. And, as a result, the question about how much they could have mitigated is irrelevant."

[14] Here is the instruction verbatim:
 "If you find the Trustees have breached one or more provisions of the Note and Security Agreement, you must consider whether any such breach was material. A material breach is one that is important or serious enough to jeopardize Zacadia's contractual right to receive what it is entitled to. Only a material breach gives Zacadia the right to terminate the Security Agreement or force the Trust to pay Zacadia now.

Judgment was filed July 11, 2012, a motion for JNOV filed 15 days later on July 26, the JNOV motion (and related post-trial attacks on the judgment) were denied on August 27, and Zacadia's appeal from the defense judgment was filed September 18.

## III.  DISCUSSION

### A.  *The Nature of Zacadia's Argument*

Zacadia's appeal presents variations on but a single theme:  The court erred in telling the jury any breach had to be *material* to justify acceleration.  On appeal, Zacadia points us to a line of authority to the effect that "any breach" that causes "measurable injury" gives an injured party a right to damages.  (1 Witkin, Summary 10th (2005) Contracts , § 852, p. 938 ["Any breach, total or partial, that causes a measurable injury, gives the injured party a right to *damages as compensation therefor*." (Italics in original.)]; e.g., *Brawley v. J.C. Interiors, Inc.* (2008) 161 Cal.App.4th 1126, 1134 [citing Witkin].)  From this authority Zacadia deduces that the trial court erred in telling the jury a breach had to rise to the level of materiality before the jury could award damages, because, after all, any old breach should entitle it to at least some damages.

Significantly, Zacadia does not argue the evidence *compels* a finding the trust's four breaches were material.  Zacadia thus impliedly concedes two things:  First, there was substantial evidence on which the jury could reasonably find the breaches *were not* material.[16]  Second, if the jury instruction was indeed correct, it cannot recover any damages.   And we reject Zacadia's argument for two basic reasons:  First, the argument was waived by the very nature of the evidence presented, and the relief sought, by Zacadia at trial.  Second, as applied to *this* case, the idea that a nonmaterial breach should entitle Zacadia to some damages is exceedingly wrong on the merits.

---

[15]    We will not be drawn into the discussion in the briefing as to whether Zacadia waived its objection to the instruction in the process of working through the jury instructions and special verdict form.  We will assume Zacadia preserved the issue for appeal and go from there.

[16]    The evidence that none of the breaches threatened Zacadia's $12 million profit in 2027 is in fact overwhelming.  At its arguable lowest of about $240 million in 2005, the trust still possessed assets in the form of its then 86 percent interest in the partnership that amounted to *20 times* what would be due in 2027.

13

B. *Waiver*

Zacadia's argument as now presented on appeal amounts to changing its whole theory of the case presented to the jury and the trial judge.  This is not something it is allowed to do – it is unfair to both its opponent and to the trial court.   (See *Flatley v. Mauro* (2006) 39 Cal.4th 299, 321, fn. 10 ["Mauro may not change his theory of the case for the first time on appeal."]; *In re Estate of Westerman* (1968) 68 Cal.2d 267, 278-279 ["no reason appears why we should not apply the established rules that a party to an action may not, for the first time on appeal, change the theory of the cause of action"]; e.g., *Dey v. Continental Cent. Credit* ( 2008) 170 Cal.App.4th 721, 731-732 [no abuse of discretion in denying leave to amend where theory of amendment was not "apparent or consistent with" appellant's "theory of the case"].)

First, let us note one thing that is easy to overlook.  The instruction the trial judge gave the jury did not say what Zacadia would now have us believe it said, i.e., that in order to obtain "any damages" the jury had to find a "material breach."  The jury instruction actually said that in order for Zacadia to have "the right to terminate the Security Agreement or force the Trust to *pay Zacadia now*" (our italics), the breach had to be material.

We point this out to emphasize just how dramatically Zacadia has changed its theory from trial to appeal.  At trial, Zacadia's theory of the case was that it was entitled to have its entire $12 million profit due in 2027 accelerated 15 years.  Echoing the television commercial, Zacadia *wanted its money now!*  (Cf. *People v. Pangan* (2013) 213 Cal.App.4th 574, 581, fn. 6 [part of general discussion on the difference between having money in hand in the present and having only a right to receive that money in the future].)  This is the reason Zacadia's counsel maintained to the jury that Zacadia had no obligation at all to mitigate its damages, and told the jury it should accommodate Zacadia in its desire to immediately *terminate* the contract.  To repeat from his closing argument: "And that's what brings us *to the relief that we seek here today*.  Because Ms. Ziskin does

14

not want to play with them anymore. *She doesn't want to be in business with them anymore.*   And under the rules they wrote, she doesn't have to be."   (Italics added.)

Having chosen the all-or-nothing approach of termination and acceleration, Zacadia failed to put on evidence which might – at least in theory – have justified *some* damages, even if the four breaches did not rise to the level of materiality.  Conspicuously missing from this case, for example, is any evidence that any of the four "breaches" actually harmed Zacadia in any way.  There is no evidence that the 2005 transfer of 14 percent of the trust's interest in the partnership or the receipt by the trust of distributions from the partnership, diminished the probability of Zacadia being repaid by any percentage.  And in light of the 2007 redemption and evidence that the value of the partnership had actually increased in the period between the 2002 loan and the 2012 trial, such a theory would have been untenable.

We note here that Zacadia's right to be paid $12 million in 2027 is analogous to the value of corporate or government bonds, which are nothing more than IOUs promising to pay a certain amount of money at a certain time, in the bond market. There is an open market for such bonds.  In theory, Zacadia might have presented evidence that the open market resale value of its right to receive the $12 million in 2027 – essentially the equivalent of a bond in the bond market – had been diminished by X percent when the trust transferred 14 percent of its interest in the investment partnership to Alexander.[17]  If Zacadia had been interested in simply collecting *some* damages for any breach, that is the sort of evidence it would have presented.  It wasn't, probably because such evidence would only have yielded a de minimis recovery or none at all. The evidence in this record, in fact, shows that, as far as the preservation of its collateral

---

[17]     Or, for that matter, to allude to the three other breaches, failed to pay distributions received from the partnership, or failed to respond to two letters, or pay a $1648 legal bill.

15

was concerned, Zacadia was better off in 2007 than it was in 2002 when it made the loan, and significantly better off even by 2010.[18]

Zacadia's failure to challenge the jury's finding of materiality, to the contrary, is suggestive of a recognition that it has no evidence to indicate any increased risk of default by the trust in the year 2027.  To say, then, that the trial court was obligated to tell the jury that it should have awarded *some* damages, even if relatively small, if it found *any* breach would be, in effect, to countenance the sandbagging of both the trust and the trial court.

C. *Merits*

Zacadia fares no better on the merits.  Its legal argument is nothing less than a frontal assault on the doctrine of material breach in California.  Reduced to its essence, the argument is:  There is no doctrine of material breach in California; if loan documents, read literally, provide for an acceleration or forfeiture if there is any breach of the agreement – no matter how trivial or benign in terms of the breacher's ultimate performance – then the law requires the acceleration or forfeiture.

Zacadia's main authority, the Witkin treatise's comment to the effect any breach gives a party a right to compensatory damages itself belies Zacadia's argument. (See 1 Witkin, Summary 10th (2005) Contracts, § 852, p. 938.)  Sometimes it pays to read a few lines on down.  The trial judge here obviously did.  Witkin goes on to say that the *important question* is whether the breach is material so as to justify the *termination* of the contract:  "The important question, however, is whether a particular breach will also

_____

18      It doesn't take too much imagination to see why Zacadia did not attempt to show any "measurable" damages from the 2005 transfer.  Suppose, for example, that Zacadia presented expert testimony to the effect that its right, as it existed in 2005, to receive $12 million in 2027 had a present value of $X just prior to the 14 percent transfer of the trust's interest in the investment partnership to Alexander.  Depending on the anticipated rate of future inflation applied to arrive at that present value, $X would might have been quite small to begin with.  And, because Zacadia's right is the functional equivalent of a private bond, investors would have required a further discount to take into account the risk of default.  The *increase* in *that* discount to take into account any increased risk of default from the transfer to Alexander would then have had to been estimated and quantified, and that increase would have been the true measure of Zacadia's damages.   But such an approach might have yielded a sum smaller than the attorney's fees incurred to obtain it.

give the injured party the right to refuse further performance on his or her own part, i.e., to terminate the contract. The test is whether the breach is material, and a total or complete breach is of course material and a grounds for termination by the injured party." (1 Witkin, Summary 10th (2005) Contracts, § 852, p. 938, citing authorities.) Witkin then states almost exactly what the trial judge told the jury: "Whether a partial breach is material depends on the importance or seriousness thereof and the probability of the injured party getting substantial performance." (*Ibid*.)

Witkin's authority, in turn, included Professor Andersen's study of the doctrine of material breach. (See Andersen, A New Look at Material Breach in the Law of Contracts (Summer 1998) 21 U.C.Davis L. Rev. 1073 (Andersen Material Breach article).) Professor Andersen points out that the doctrine of material breach centers on the problem of protecting a party's *future expectations*. (See *id.* at pp. 1096 ["The moment a contract is formed each party acquires an interest in the likelihood that the contract will be performed in the future as agreed. The most important element of that interest is the probability that the other party will perform as and when agreed."]; 1079 and 1094 [emphasizing the role of the victim's "expectation interest"].)

More specifically, the material breach doctrine arises out of the problem of a sequence of promises, some of which are only preparatory to a party's main performance. When a promise of preliminary performance is breached, the other party has some reason to be concerned about later performance which goes to the heart of the contract, and may thus want to terminate the contract rather than be put in the position of being required to wait until the other party fails in the main performance and then suing for damages. In the original 1773 case that underpins the doctrine, for example, the seller of a silk business on the installment plan – a business not yet turned over to the buyer – had every reason to worry that the buyer wouldn't make the payments after the business was turned over because the buyer did not furnish security for his future payments, another term of the contract. The buyer argued the seller should have waited to see if the

17

buyer ever defaulted on his payments, and *then* sued for damages. But that line of thought forced the seller to incur the significant risk of future nonperformance by the buyer. Lord Mansfield solved the problem by holding that the preliminary failure to furnish security was itself a material breach on which the seller's own performance was dependent, thus allowing the seller to terminate the contract prematurely. (See Andersen Material Breach article, *supra*, 21 U.C. Davis L. Rev. at p. 1079 and p. 1079, fn. 17 [discussing *Kingston v. Preston*, Lofft 194 98 Eng. Rep. 606 (N.D. 1773)].) The essential idea of the doctrine of material breach, then, is to use materiality as a gauge to determine whether the "victim" party is justified in withholding its "own remaining performance." (*Id.* at p. 1077.)[19]

It does not take much imagination to see that without a requirement of materiality, "harsh" results might occur. (See Andersen Material Breach article, supra, 21 U.S.Davis L. Rev. at p. 1077.) Harsh results are a particular risk in lender-borrower transactions where the borrower may owe the lender a series of individual performances, and the lender may claim that a de minimis or technical breach of one of those performances entitles it to a windfall. In both *Bisno v. Sax* (1959) 175 Cal.App.2d 714 and *Baypoint Mortgage Corp. v. Crest Premium Real Estate Investments* (1985) 168 Cal.App.3d 818, 829 the California Court of Appeal refused the efforts of lenders to foreclose on property for nonmaterial defaults involving later payments.[20] *Baypoint* in particular uttered some very pointed language against forfeitures. (See *id.* at 829 ["'The

---

[19] From 1773 to the present, the basic idea that the material breach doctrine is rooted in an alteration of the performance otherwise required of the "victim" of the breach has remained the same. (See *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277 ["When a party's failure to perform a contractual obligation constitutes a *material breach* of the contract, the other party may be discharged from its duty to perform under the contract." (Italics added.)].)

[20] Zacadia tries to minimize the impact of *Bisno* by claiming the case involved only a single payment a day late. No, there had been a series of small defaults in *Bisno* which the borrower had attempted to cure, but somehow never seemed to get the actual balance of the loan as it then stood paid off. The day-late payment was at the trial of the lender's foreclosure action, when, despite its previous efforts, the borrower still had to make a payment of a certain sum to bring its balance current.

18

law looks with disfavor upon forfeitures  . . . .   It is particularly reluctant to enforce forfeitures where the default is minor."]

Zacadia's counter to *Bisno* and *Baypoint* is to confine them to the realm of equity jurisprudence, as if to say, "well, yes, we couldn't *foreclose* on the trust because to do that we would need the help of a court of equity, but, since this is an action at law, we are entitled to acceleration because the contract says so, regardless of the materiality of any breach."

No.  The refusal to enforce forfeiture clauses without any real injury to the putatively aggrieved party has been declared by our Supreme Court to be a matter of the common law and not just equity, as explained by Justice Traynor in *Freedman v. Rector etc. of St. Mathias Parish* (1951) 37 Cal.2d 16.  In *Freedman*, a buyer of certain property backed out of a deal, then changed his mind, and sought specific performance of the transaction.  Of course, as the court explained in the first part of its opinion, he wasn't entitled to it because he really had backed out.  (See *id*. at pp. 18-19.)  But the second part of the opinion dramatically changed tenor as it confronted the seller's desire to keep the buyer's down payment of $2,000.  The seller had incurred no real damages from the buyer's inconstancy; in fact, the property was eventually sold for about $2,000 more than the contract price.  But the seller still wanted to keep the buyer's down payment of $2,000, because, after all, there was a provision in the contract providing that in the event of the buyer's default the seller could keep the down payment.  (*Id*. at p. 23.)

And that provision, said our high court, was not enforceable *as a matter of law*.  (*Freedman, supra*, 37 Cal.2d at p. 23.)   The court reasoned it would be inconsistent with the statutory provisions in the Civil Code limiting punitive and liquidated damages to enforce the provision of the contract allowing for a forfeiture of the down payment

19

"without regard to the *actual* damage suffered." (Id. at pp. 21-22, italics added.)[21] The passage is worth quoting for its obvious applicability to the case at hand: "To permit what are in effect punitive damages merely because a party has partially performed his contract before his breach is inconsistent both with section 3294 of the Civil Code limiting the right to exemplary damages and sections 1670 and 1671 dealing with liquidated damages. 'A penalty need not take the form of a stipulated fixed sum; any provision *by which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty*.'" (*Ibid.*, footnotes omitted, quoting *Ebbert v. Mercantile Trust Co. of California* (1931) 213 Cal. 496, 499; accord, *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 737 ["The mere fact that an agreement may be construed, if in fact it can be, to vest in one party an option to perform in a manner which, if it were not so construed, would result in a penalty does not validate the agreement."].)[22]

Then, laying a trail which both *Bisno* and Baypoint would later follow, the *Freedman* court set forth some very powerful antiforfeiture language: After concluding that the "policy of the law against penalties and forfeitures" in California would not permit the seller to keep the down payment (*Freedman, supra,* 37 Cal.2d at p. 20), the *Freedman* court rejected the position that would have allowed such forfeitures and penalties, declaring it would permit "*unjustifiable penalties for breach of contract . . . .*"

---

[21]    Small statutory detail: Civil Code section 3275 states: "Whenever, by terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of grossly negligent, willful, or fraudulent breach of duty." The interesting thing about Traynor's analysis in *Freedman* is that the common law policy against forfeitures *went beyond* section 3275's provision for relief in cases of merely negligent breaches. That is, even if the buyer in *Freedman* had acted willfully, he *still* was entitled to get his downpayment back. (See *Freedman, supra*, 37 Cal.2d at p. 22.)

[22]    Zacadia points to one-sentence Civil Code section 3302 as if it were the prooftext that California statutory law requires it be paid now for money otherwise due in 2027. The statute provides in total: "The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon." Apropos what we have said about waiver, this statute has no application to *this* case, because this case does not involve a breach of the family trust's obligation to pay money in the year 2027.

(*Id*. at p. 21, quoting Ballantine, *Forfeiture for Breach of Contract* (1921) 5 Minn.L.Rev. 329, 341, italics added.)

*Freedman* remains quite viable as precedent today. This court's most recent invocation of it as precedent in a published decision was in *Kuish v. Smith* (2010) 181 Cal.App.4th 1419, 1422 ["defendants' retention of $600,000 of plaintiff's deposit constitutes an invalid forfeiture within the meaning of the California Supreme Court's decision in *Freedman v. The Rector*"]; *Greene v. Municipal Court* (1975) 51 Cal.App.3d 446, 450-451 [seller not allowed to retain down payment and subsequent payments in the guise of rent in the event of default]; *NIVO 1 LLC v. Antunez* (2013) 217 Cal.App.4th Supp. 1 [failure by lessee to maintain insurance did not justify forfeiture of the entire lease].)

Zacadia's position on appeal is nothing less than naked assertion of an entitlement to a forfeiture. Under Zacadia's theory, in return for being a mere conduit in a scheme to avoid taxes, Zacadia would walk off with *far more* than the tidy $12 million profit in 2027 it bargained for. First, it would gain a windfall by virtue of the acceleration. The value of $12 million to be received in 2027 is not $12 million. For example, if one were to use the interest Zacadia itself agreed to pay the partnership as the appropriate discount rate (the reduction in the value of the money to take into account anticipated inflation over the 15 year period 2012 to 2027), it might be as low as $3.5 million.

But on top of that potential windfall, Zacadia's claim concerning what it calls the "distribution breach" is overreaching – perhaps overreaching squared. Zacadia

21

gets $42 million *now* for a breach that caused it no damages and no anticipated reduction in the probability of payment in 2027?[23]

We further determine in the context of the "distribution breach" that it is entirely predicated on the prior "breach" of the 14 percent transfer, as if once that happened, the *Graegin* loan became a slot machine programmed to give Zacadia a big payout.[24] But Zacadia forgets there was plenty of evidence Kenneth Ziskin himself drafted the 14 percent funding agreement by which the interest went from the trust to Alexander. Further, there was also plenty of evidence Ziskin did *not* advise the trust Zacadia might claim the transfer was a default. Given that Zacadia is essentially nothing more than Ziskin's right arm, even if, for some reason, the "distribution breach" were material, Zacadia would be estopped to assert it as a basis for acceleration. (See e.g., *Emma Corp. v. Inglewood Unified School Dist.* (2004) 114 Cal.App.4th 1018, 1031 [public entity estopped to enforce contract where it deliberately misled bidder from complying with bid withdrawal statutes]; *Fernandez v. American Sav. & Loan Assn.* (1984) 159 Cal.App.3d 667, 672 [noting lender conduct in regard to assumability of loan could mislead buyers and estop lender from asserting due on sale clause in order to accelerate loan].)

And the two other breaches – failure to answer two letters or honor a reimbursement request for $1,648, are virtually invisible in the context of the transaction

---

23    We're not kidding about the scope of Zacadia's claims. In its reply brief it tells this court we should enter judgment giving Zacadia the full amount of the distributions from the partnership – which, we know amount to about $42 million – *plus* the remaining amount of the note "now due and payable as a result of acceleration" – which we know to be $331 million. Or, to put it another way, Zacadia tells us to enter judgment on appeal for an amount of about $373 million in a case where Zacadia didn't attempt to show that any breach actually threatened what it bargained for – a $12 million profit in the year 2027.

24    The jury found a breach because of the transfer. The family trust argues that because of the 2001 probate court decision, it really wasn't a breach at all, because the probate court decision established that the 2 million shares worth of Herbalife stock were never *really* a part of the collateral to begin with. Because we determine it was not a material breach – assuming for sake of argument it was a "breach" at all – we need not address the merits of the trust's argument, which essentially amount to saying there was a lack of substantial evidence on which the jury could find the 14 percent transfer was a breach.

as a whole.[25]  The trial judge's instruction to the jury was correct even if Zacadia hadn't waived the issue.

DISPOSITION

An ironic fact in this case is that in the period 2006 to the filing of this action in 2008, the trust offered to cash out Zacadia by paying it the present value of the obligation due in 2027.  Zacadia rejected the offer.   It wanted the forfeiture literally provided for in the contract.  Befitting Zacadia's refusal of the chance to be made whole, it is worth noting that in a companion case, we affirm an order that Zacadia pay $2.5 million in attorney's fees to the trust as against the *trust's* argument the sum is *too small*.

In this case we affirm the judgment that Zacadia take nothing, and further declare that justice most certainly requires that the trust recover its costs on appeal.


                                                    BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


ARONSON, J.

---

[25]     In theory, Zacadia might have sued the trust for reimbursement of the $1,648 lawyer bill and succeeded.  If *that* had been its theory, the case wouldn't have gotten to court – $1,648 isn't even lunch money to a trust worth $320 million.  To allude to what Zacadia's counsel told the jury in closing argument, that was not what "this case was about."

23